May it please the Honorable Court, Richard Schoenfeld appearing for the appellant, Joe Quassani. I'd like to reserve three minutes for rebuttal. With the limited time available today, I'd like to focus on two issues. The first issue is the prosecutorial vouching, and the second issue is the improper application of the sentencing guidelines as to Mr. Quassani. Because the vouching went without objection, it's reviewed for plain error. Plain error is that which seriously affects the fairness, integrity, or public reputation of the judicial proceedings, or where failing to reverse a conviction would amount to a miscarriage of justice. And we find that in the Neko Chia case. There are two methods by which a prosecutor can improperly vouch for a witness. The first is by placing the prestige of the government behind a witness through personal assurances of the witness's veracity. And the second is by suggesting that information not presented to the jury supports the witness's testimony. And we find that in U.S. v. Roberts. We have both occurring in this case. This is especially significant here because the credibility of the two witnesses was the driving force behind the ultimate conviction. This is particularly true as to the second alleged fraudulent transaction, the Moraine Drive transaction. The testimony at the trial, and there were substantive counts as to the Moraine Drive transaction for which Mr. Quassani was convicted, the only evidence as it relates to the Moraine Drive transaction was the testimony of Mr. Qureshi. There was no paper trail as to Mr. Quassani. He was not the realtor. He was not the mortgage broker. He did not set up shell corporations, as the two cooperating witnesses testified they did. And there was no record of him receiving any compensation related to that transaction. The conviction on those counts rested solely and entirely on the testimony of Mr. Qureshi. And this is significant when it comes down to analyzing whether the error in this case was harmful. In U.S. v. Roberts, the first form of vouching in this case was the introduction of the plea agreement's truthful telling requirement. In the United States the plea agreement is the first form of vouching in this case. Kennedy. Who first mentioned the plea agreement? Who brought the plea agreement up during the trial? Prosecutor, on direct examination. First, in opening statement, the prosecutor outlined that these two witnesses are not coming in out of the goodness of their heart. They are coming in because they have pleaded guilty and are cooperating with the government. That's the first reference to anybody taking a plea agreement that is going to testify in the case. In response to that, in the appellant's opening statement, he stated that the testimony  which means they have admitted to lying in the past, and that the government has made a deal with the devil. That was in the appellant's opening statement, responding to the opening statement of the prosecutor, which is found at ER 836, the government's opening statement. Then what we have on direct examination is the prosecutor asking, what are your obligations under the plea agreement, to which Mr. Qureshi answers, to answer honestly. He is then asked, are you still waiting to be sentenced? And the answer was yes. This is the case. Kagan. Let's talk about the vouching that you say occurred during the direct examination of the witnesses. So it was brought up in testimony first by the government, but was there an attack on the witness's credibility during counsel's opening statement that would have merited the government's questions as a response to the defense challenge of the witness's Well, first, I don't believe there was. And the reason for that is that the government was the first to raise the fact that a guilty plea agreement had been entered into by the two cooperating witnesses and that they are testifying under obligation of the plea agreement. So the government is the first to reference that there is this guilty plea agreement. The attack thereafter is the attack that U.S. v. Roberts has recognized that a defendant was always permitted to engage in, which is plea agreements give somebody some motive and some bias. So why is an opening statement referred to witnesses taking deals? Isn't that a reference to a plea agreement? Well, the prosecutor had already said that those two witnesses had entered plea agreements. So it was a response to the prosecutor's opening statement. And what we can't have is somebody opening a door or at least pulling it a crack open, inviting the defense lawyer to then make an argument and then say, oh, well, now he's opened the door. So they elicited the response from the defense lawyer that was engaged in in the opening statement that he presented to the jury, and now they want to take advantage of that and say that this was an invited response to what he did, but it's the opposite. This was an invited response to the prosecutor's opening statement where he specifically referenced the two cooperators testifying pursuant to plea agreements. But it gets worse in this case because it takes it even further than the U.S. v. Roberts holding. And I understand that the government cites Dorsey, where it says that you can introduce the truthfulness requirements of a plea agreement if it is in response to attack on credibility. But what we have here is worse. We have the type of thing that was expressly discussed in the U.S. v. Combs case, where we have to weigh all of the factors. We have direct vouching in the form of the following. During the government's rebuttal closing argument, and this is the second form of vouching where the government actually tells the jury that the person has told the truth. So after going through all of the truthfulness requirements in a plea agreement, saying you're obligated to tell the truth, it's the government that makes that determination, it's the government that decides whether or not we recommend a low sentence to the court, it's the government that decides whether you have blown up your plea agreement, as one of the witnesses had described it, they say the following in their rebuttal closing argument. I can't even imagine what it must have been like for him, Mr. Qureshi, to tell his kids that they couldn't see their cousins, their friends anymore because something daddy did. And it wasn't just the crime that meant this had to happen. It was his cooperation with the government and his telling the truth about his cousin. Two problems with that statement. Number one, the prosecutor just vouched for the truthfulness of the testimony after having gone through the court. With that, frankly, he's not saying that I know from outside sources that he's telling the truth. He's obviously arguing in favor of the testimony being given by the witnesses he called and sponsored as being truthful. Now, that's kind of inherent argument. What makes that vouching? Two reasons. One is there was absolutely no testimony that there was a conversation between Mr. Qureshi and his children that they couldn't associate with their cousins anymore because of something daddy did. Well, that's not vouching. That may be argument not based on evidence, but what makes that vouching? Well, under the holding in U.S. v. Roberts, if you take something that's extrajudicial and you bring it in, that's the second form of vouching. But where it really becomes clear to me If I have information from the outside that tells me that this witness is telling the truth, there's nothing there about that. Well, but then he specifically says it was his cooperation with the government and his telling the truth about his cousin that caused them to no longer have this relationship. So how does that suggest the government or the prosecutor has extrajudicial information? Because it discusses a conversation that was never admitted into evidence in reference to the government. It doesn't demonstrate any truthfulness of testimony. It's not like the government prosecutor is suggesting, look, I've got this secret report that tells all these investigations and I've got information that can corroborate what the witness says, but of course I'm not sharing that with you. You take my word for it. That's vouching. In isolation. What's here? In isolation, I would agree, but let's look at the next form that occurred. During the rebuttal closing argument, the prosecutor then says the following. But the question is not whether they lied in the past, referencing these two cooperating witnesses and defense counsel's argument that by admitting to a fraud, they are admitted to being liars. It is not questioned whether they lied in the past. The question is whether they were lying to you on the stand, and I submit they weren't. Excerpt of Record 1253. So when we take a look at the next form, and I'm going to read it to you, and I'm going to read it to you, I submit that they weren't. I submit that the Cubs are going to win the World Series this year. Well, but a prosecutor has a special obligation. I'm a Cub fan. What can I say? A prosecutor has a special obligation in the criminal justice system where they cannot vouch. It's U.S. v. Roberts, they introduced plea agreement, truthfulness requirements. You couple that with the extrajudicial statement regarding talking to the children. I'm saying that I submit is a figure of speech and doesn't suggest anything more than that. Isn't it, in fact, the classic way in which you say, I think you can find on the evidence that he was telling the truth. That's just, that's understood, that's what I submit conveys in ordinary language. Now, it's got to be based on the evidence. And, of course, the possibility, even the remote possibility that the Cubs would win the World Series is not based on any circumstantial evidence I'm aware of. But the, putting that aside, you have my point. I understand the point. However, I would respectfully submit that in this case, when you look at the totality of the circumstances, as we have to do under U.S. v. Combs, you can't just look at one isolated incident. You look at all of the incidents of vouching and U.S. v. Roberts, U.S. v. Shaw. They all acknowledge that introducing the plea agreement's truthfulness is a form of vouching, whether it be mild vouching or outright vouching. It suggests that the prosecutor is the one who can verify whether the testimony is truthful, and they're the ones asking the questions. Then you have in the closing statement where he says, I can't imagine the conversation that you can't talk to your cousins anymore, and it's because he cooperated and told the truth. And then you have, further to that, that I submit they were telling the truth in response to the defense lawyer's argument that the witness has lacked credibility. When you couple it all together and you take the clear fact that the only evidence related to the Moraine Drive transaction was Mr. Qureshi's testimony, it becomes problematic under all of the cases, even though the Roberts case has become glossed, as the Court said in U.S. v. Shaw. It is the same. And the problem in Roberts is a specific argument that says there's this detective sitting here monitoring the witness's testimony to make sure that he stays truthful. Do we have anything like that here? We have the prosecutor saying that you're required to tell the truth and I'm the one who gets to decide it, and then in closing argument saying, I submit that he told the truth. Okay. Moving on to the second issue with the limited time I have, the district court does not share what this Court has in reviewing a guideline sentence being presumptive. The district court is not allowed to assume that a guideline sentence is presumptive. And in this case, what the court did was place a burden on Mr. Cassani to take the case outside of the heartlands of the guideline. Well, our decisions tell the district court, start with the guideline sentence. And precisely How's that different? Because here's what happened. You have Mr. Cassani, who's 42 at the time of his sentencing. In this case, he committed the – allegedly committed the offense at 36 years old. No criminal history whatsoever. Married for 17 years. Four daughters from age 1, 9, 12, and 16, letter after letter, establishing his character, work history, and that this was aberrant conduct. And that's at Excerpt 337. But the question is, is there anything in the record that shows that the court did not start with the guidelines as a starting point and then went on from there? The court started – you're correct. The court started with the guidelines, advised the defendant what the guideline range was, but then placed a burden on the defendant to take the case out of the guidelines. And what the court said was the following. Found that Mr. Cassani had no criminal history, was a dedicated family man, had strong family support, had strong family needs. He then concluded, I just don't see anything that pulls this case out of the guidelines with the possible exception of sentencing disparity. And what that was is that the two cooperating witnesses received a sentence of one day. However, what the court didn't take into consideration is that they had a second indictment, just the two of them, alleging additional fraudulent transactions, and they engaged in a cover-up scheme at the real estate division obstructing justice so that they wouldn't get caught, compared to Mr. Cassani having been directly involved, according to the trial testimony, in only one transaction. The court then stated, notwithstanding, I appreciate the argument of the defense. They are well made and they are well presented, but I don't feel that they take me out of the sentencing guidelines as I look at this. Again, placing a burden on Mr. Cassani to remove the case from the guidelines when, in reality, the guidelines are one factor and they cannot be presumed to be correct at the district court level. And when we look at the Kimbrough decision and Justice Scalia's concurring opinion, it was said that you cannot place a thumb on the scales in favor of the And to save the balance of your time for rebuttal? Yes, please. Okay. And we'll hear from the government. May it please the Court, Ellen Meltzer for the Department of Justice. I'll address the issues in the reverse order that Mr. Schoenfeld did. There is absolutely no evidence in the record that the court presumed that the sentencing guidelines in this case were reasonable or gave any undue weight to those guidelines. The court did start with the guidelines. It determined that the PSR calculation of the sentencing range was correct. The court then discussed the relevant 3553A factors. It discussed the nature and the circumstances of the offense. The court talked about how the conspiracy in this case was solely for the personal gain of the co-conspirators. It discussed the history and the characteristics of Mr. Kasani. It talked about his support of close family and that he had no criminal history prior to this. And it also talked about the potential sentencing disparity with Anita Mather and Sean Qureshi, but the fact that those defendants had pleaded guilty and entered into an agreement with the government to cooperate in this case. And that the government had issued 5K1.1 letters in this case for departures. It weighed those factors and it considered all of Mr. Kasani's arguments. That's clear from the record. The court's decision to impose a sentence at the lowest end of the relevant guideline range does not establish in any manner that the court presumed that the guidelines undue weight. The court's statement that I don't see anything that takes this case out of the guidelines is not a presumption that the guideline range was reasonable. It's a conclusion, after weighing all of the factors and looking at all of the evidence in this case, that a sentence within the guidelines range was reasonable, and it's nothing more than that. Unless the court has any questions on the sentencing issue, I'd like to move to the government's vouching issue. Contrary to Mr. Kasani, with one possible exception, the government did not vouch for any of its witnesses during its direct examination, during its redirect examination, or during its rebuttal argument. The evidence of Mr. Kasani's guilt in this case was overwhelming, and the one possible single exception does not rise to the level of reversible plain error. It did not affect his substantial rights. It could not have affected the verdict in this case. And certainly, a miscarriage of justice will not result if this Court does not reverse his conviction. As this Court has pointed out, vouching is the giving of a personal assurance of a witness's veracity, and there's only one possible instance where that occurred in this case. What's the one? The one which Judge Clipton disagrees with, that it was a matter of vouching, is where the government stated in rebuttal, the question is not whether the witnesses lied in the past, but whether they lied on the stand, and I submit that they did not. That is the only possible instance of vouching in this case. Prosecutors are drilled to try to avoid the first-person singular in argument, and yet it does work its way in, and it worked its way in here. How is that not putting the prosecutor himself on the line and saying, believe me, believe what my witnesses say? It's the only instance where it might have occurred, Your Honor, and if that indeed is vouching, yes, it was improper, but it's certainly not. Why are you saying it's vouching? I mean, I appreciate your punctiliousness, but the isn't it commonplace to when you use the term, I submit to you X or I submit to you Y. I submit that it's commonplace. Isn't that a shorthand for you may find from the evidence such and such, that the evidence is such and such, isn't that how it's understood in normal parlance? Yes, it certainly is, Your Honor, but I haven't seen it in many cases in all candor where a prosecutor says that after talking about whether a witness lied or concerning a witness's veracity. And so that's the only instance which gives me pause in this case. Because prosecutors are so trained not to do that. If you're going to say I submit, you then would tend to say I submit the evidence shows that he wasn't lying. But frankly, I'm less troubled by that than by the eliciting of the incentives to tell the truth and the consequences of being untruthful on direct examination. In my experience, I find that to be unusual. Well, Your Honor, the fact that the government introduced the plea agreements very briefly during its opening statement is certainly not improper. There's no authority that's been cited to this quarter. There is in the Ninth Circuit that says that the government cannot introduce the simple fact that its witnesses pleaded guilty. It's oftentimes done in order to soften the blow on cross-examination of those witnesses. But that's not the problem. If they'd simply said these are people that have done bad things and they've pleaded guilty, we wouldn't have this argument about vouching. The problem is the emphasis on the truthfulness provision and the fact that if the government decides that this testimony being offered up isn't truthful, translated to doesn't satisfy the government, these people may be made to pay in the future. Your Honor, the latter part about what the repercussions would be occurred in redirect examination. All that occurred during direct examination of Anita Mather and Sean Qureshi is simply that the government asked them whether they had pleaded guilty, what they pleaded guilty to. They both said that they pleaded guilty to conspiracy, and they were asked what their obligations were under those plea agreements. And both of them said that they were obligated to testify truthfully. That's all that occurred. It was Mr. Quesani who attacked their veracity repeatedly. During opening statement, he called them liars. He said that they had made a deal with the devil. He's talked about their testimony being motivated. And the word liar, liar, liar was just repeated and repeated and repeated during his opening. He is the one who introduced the actual plea agreements and evidence, who had them marked, who had them introduced in evidence as exhibits. He is the one who had the witnesses read the actual truth-telling provisions to the jury. It was not the government. And he was the one who introduced the substantial assistance sections to the jury. It was not the government. What the government did on redirect examination was ask the witnesses what would happen if they lied during their testimony. Under this Court's decision in Dorsey, that is precisely the type of testimony that is permitted in response to a defendant's challenges to the witness's credibility based on those plea agreements. And that occurred here both during his opening and during his cross-examination. Any suggestion during the government's rebuttal that the witnesses had an incentive to tell the truth was, again, in response to persistent attacks by the defense counsel in closing that they were liars. And I counted the word liar at least 20 times during his closing examination. Under this Court's decision in Parker, it's certainly proper to tell the witnesses or the jury about the incentive to tell the truth after those types of attacks on credibility. Unless the Court has any additional questions on the juror not being excused issue. I have a question on a totally different subject, and I just want largely just clarification here on the juror not being excused issue. So this AUSA who was, I gather, tangentially involved in the case, but not very directly, comes in, but enough that he came into the courtroom during the trial, and he sees the juror that he knows he knows, and he knows him well, and the Court is so sure that he knows him well, and then the Court interviews the juror, and the juror sort of denies knowing him as well as the AUSA had indicated, and also, notwithstanding that the Court says to the juror, now, of course, don't speculate as to why we're making these questions, he wasn't involved in the case, the juror begins to sort of speculate a little bit about some protocol or something that was violated. Why? You know, it's a little bit of a credibility issue I'm raising. The juror doesn't fess up to knowing the guy as well as the government said he did. It's a little bit about the very fact of the interview gives the juror sort of, you know, the judge that says, be sure not to tell any of the other jurors about this interview. Why didn't he just, why wasn't it appropriate? I'm not suggesting yet that there's any legal problem here, but I'm just trying to inquire why the juror, why not just simply replace this guy with the alternate juror? The standard is whether or not the juror is biased or prejudiced. And the fact that the juror has a different view of his relationship with AUSA Dan Scheiss does not make him biased or prejudiced. Well, if the juror, now, in the original voir dire, there wasn't a direct question about Mr. Scheiss, but there was questions about other people. And are you saying that if a juror on voir dire lies and says, I don't know X what he does, a prosecutor or a defense counsel for that matter, that that's not cause to remove him? That certainly is cause to remove him. So it's not just a question of bias. It's a question of whether he is lying about a relationship. Right. There could be three bases for removing it. It could be removal. It could be making false statements so that it's McDonough type prejudice. It could be actual bias or it could be implied bias, but there weren't any of those. Why is it, and again, I'm not, I don't want to push this too far. But there's at least a suggestion that the juror's not being candid about his relationship with the AUSA. Yes, the government actually stipulates that they know each other well. That's the page 1275 of the record. And yet the juror sort of says, oh, we had a few conversations. Juror says that, right, that their children know each other and that they had two or three lengthy conversations during their relationship. I think that people can have different perceptions of relationships with each other. And that was Juror Roberts' perception. I don't think that he's not telling the truth. The court questioned him extensively and listened to his responses about the fact that he could be 100% fair and impartial. The court said that it had watched him during the trial, and then it didn't have any reason to believe that he was biased or prejudiced. As to what he was asked during the voir dire itself, he was asked, as every juror was asked, whether they knew anybody in the U.S. Attorney's Office, and he's, only one person responded or two people responded affirmatively. As even Mr. Shice said, he didn't know whether Juror Roberts knew that he worked for the U.S. Attorney's Office. So there's no reason to think that Juror Roberts answered untruthfully. In fact, when the juror was questioned, when he was called into the court, he said that he didn't even remember that he had been an attorney, and that when he saw AUSA Shice enter the courtroom, he wondered, what is he doing here? I wonder if he's an attorney. So I don't think that there's any basis for a cause removal in this case. Okay. Thank you, Your Honors. Thank you. We'll hear rebuttal. Thank you. Just briefly, I'd like to touch on that last issue. It should be noted that Mr. Shice was quite candid when he provided testimony in reference to his relationship with Juror Roberts, and what Mr. Shice said was that their children are friends, that they went to church together, that he's been to his house on two occasions to help with floats. So he detailed his friendship or relationship with the juror, and the juror's version was completely inconsistent with that. And I believe that that can form the basis for actual bias, which can even be demonstrated through circumstantial evidence under U.S. v. Olson, and we do have that in this case. Mr. Appellant Quesani used two peremptory challenges during the jury selection to remove people that had any affiliation with the government. It's clear that he would have used a challenge had this been brought out in Fort Deer. Going back to the vouching, putting it in context, I understand we're stuck on this word, and I submit in reference to the truthfulness, but if we take that whole paragraph in context, if I were to choose, if I were in Mr. Tenassi's world, and I were going to choose a conspiracy to participate in, it would be a fraud conspiracy, because that would mean that everybody else who worked with me, if they eventually saw that what they had done was wrong, and if they came to testify against me, they can just be dismissed out of hand as liars. But the question is not whether they lied in the past. The question is whether they were lying here to you on the stand, and I submit they weren't. And then we have, in summation of the closing argument, on both these witnesses, Anita Mather and Sean Caressi, they have an insentence under the plea agreement to do one thing, and those plea agreements are both in evidence, and that is to tell the truth. And they both told you that if they lied, their deals went out the window. Whatever they hope to get from the government, either in a break in sentencing or, frankly, just to have a break for the plea agreement, they have every incentive in the world, and it does come from the plea agreement. Their only incentive is to tell the truth, because if they don't tell the truth here, things get infinitely worse than they already were just by having committed the crime in the first place. And when we take all of that in totality, along with the cumulative error which the Court has permitted to consider, it certainly rises to the level of plain error affecting the fairness and integrity of the trial and should necessitate a reversal. Roberts. Thank you. We thank both counsel for your arguments. The case just argued is submitted. That concludes the calendar for this morning. We're adjourned.
judges: Rakoff, Clifton, Nguyen